IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| HANOVER INSURANCE GROUP, d/b/a HANOVER INSURANCE COMPANY, | CV-20-56-BLG-DWM-KLD |
| Plaintiff, | |
| vs. | FINDINGS and RECOMMENDATION |
| ASPEN AMERICAN INSURANCE COMPANY; HENDRICKSON LAW FIRM, P.C.; KEVIN SWEENEY; and TGC, L.P., a limited partnership, | |
| Defendants. | |

This declaratory judgment action involves a dispute over whether Plaintiff

Hanover Insurance Company ("Hanover") and/or Defendant Aspen American

Insurance Company ("Aspen") owe a duty to defend and indemnify Defendants

Hendrickson Law Firm ("Hendrickson") and retired partner Kevin Sweeney

("Sweeney") for a legal malpractice claim asserted by Defendant TGC, L.P.

("TGC") in an underlying state court action. Pending before the Court are TGC's

motion for partial judgment on the pleadings under Rule 12(c) of the Federal Rules

of Civil Procedure and competing Rule 56(c) motions for summary judgment by

the remaining parties.

I.  **Background**

There are two insurance policies at issue here. The first is a claims-made and reported Lawyers Professional Liability Insurance Policy issued by Hanover to Hendrickson for the policy period from July 1, 2016 to July 1, 2017 ("Hanover Policy"). (Doc. 2, at 14-47). The Hanover Policy covered both Hendrickson and Sweeney, who retired from the practice of law on June 30, 2017. Effective upon Sweeney's retirement, Hanover issued him a Montana Extended Montana Extended Reporting Period Endorsement – Individual ("ERP Endorsement") of unlimited duration. (Doc. 2, at 32). Effective July 1, 2017, Hendrickson obtained professional liability insurance through Aspen. The second policy at issue is a claims-made and reported Lawyers Professional Liability Policy issued by Aspen to Hendrickson for the policy period from July 1, 2019, to July 1, 2020 ("Aspen Policy").  (Doc. 8-2).

In January 2020, TGC filed the underlying legal malpractice action against Hendrickson and Sweeney in Montana's Thirteenth Judicial District Court, Yellowstone County. (Doc. 2 at 40-47). The events giving rise to TGC's lawsuit date back to 2013, when TGC retained Hendrickson and Sweeney to provide professional legal services in connection with a line of credit transaction between TGC and Vanity, Inc. and Vanity Shop of Grand Forks, Inc. (collectively "Vanity"). (Doc. 2 at 4, ¶ 17; 42). In early 2017, Vanity began preparing for

bankruptcy. (Doc. 2 at 5, ¶ 19; 44, ¶ 19).  At around that time, TGC retained new counsel to assist with the bankruptcy and discovered that Sweeney had not filed the UCC financing statements necessary to secure and perfect TGC's interest in the Vanity line of credit. (Doc. 2 at 5, ¶ 20; 44, ¶ 20).

On February 10, 2017, Sweeney emailed TGC's representatives acknowledging that he had not timely filed the UCC financing statements and that his failure to do so constituted malpractice as it would likely render TGC an unsecured creditor in the Vanity bankruptcy. (Doc. 64 at 5, ¶ 13).  On September 19, 2019, TGC's attorneys sent a letter to Sweeney and Hendrickson providing formal notice that it held a claim for legal malpractice against them, and requesting they tender the claim to their insurance carrier. (Doc. 64-1 at 17).

Hendrickson reported the TGC claim to Aspen on November 7, 2019. (Doc. 64 at 4, ¶ 9). Sweeney then reported the TGC claim to Hanover on December 2, 2019. (Doc. 2 at 5, ¶ 26; Doc. 7 at 16, ¶ 24). Hanover accepted the defense subject to a reservation of rights, and later tendered the defense to Aspen. (Doc. 2 at 6, ¶ 29; Doc. 24 at 2, ¶ 2). Aspen reserved its rights and defenses (Doc. 61-1 at 26), but did not accept tender of the defense. Hanover filed this declaratory judgment action on April 27, 2020. (Doc. 1). Several days later, on May 11, 2020, Aspen issued a coverage opinion letter denying coverage for the TGC claim. (Doc. 61-1 at 14-25).

Hanover seeks a declaration that it has no duty under the Hanover Policy to defend or indemnify Hendrickson or Sweeney in the underlying lawsuit, and that Aspen is obligated to reimburse Hanover for defense costs advanced thus far. (Doc. 2 at 1-2). Specifically, Hanover asks the Court to declare that it has no obligation to defend or indemnify Hendrickson or Sweeney because: (1) the claim was not first made and reported during the Hanover Policy period; (2) there is other insurance available from Aspen for the loss potentially covered under the Hanover Policy; (3) the claim is covered by other insurance, specifically the policy issued by Aspen; (4) Sweeney had notice of the claim prior to the ERP Endorsement's effective date, and; (5) if coverage for Sweeney under the ERP Endorsement is not barred due to his prior notice, the Aspen Policy renders the Hanover Policy inapplicable. (Doc. 2 at 10, ¶ 40).

Hendrickson and Sweeney assert a counterclaim for declaratory relief against Hanover, seeking a declaration that they are entitled to a defense and coverage under the Hanover Policy. Hendrickson and Sweeney also allege a cross-claim for declaratory relief against Aspen, seeking a declaration that they are entitled to a defense and coverage under the Aspen Policy. (Doc. 10). Aspen, in turn, brings a cross-claim for declaratory relief against Hendrickson and Sweeney, and a counterclaim against Hanover, seeking a declaration that it has no duty to defend or indemnify Hendrickson or Sweeney under the Aspen Policy in

connection with the TGC claim. (Doc. 8 at 27, 41). Finally, TGC brings a counterclaim for declaratory relief against Hanover, seeking a declaration that Hanover has an obligation under the Hanover Policy to indemnify and provide coverage to Hendrickson and Sweeney in connection with TGC's claims in the underlying lawsuit. (Doc. 7 at 9-10, 17).

The parties have filed the following motions, which have been fully briefed and argued: (1) TGC's Motion for Partial Judgment on the Pleadings (Doc. 44); (2) Hanover's Motion for Summary Judgment (Doc. 53); (3) Hendrickson and Sweeney's Cross-Motion for Summary Judgment (Doc. 57); and (4) Aspen's Cross-Motion for Summary Judgment against Hanover and Motion for Summary Judgment on Hendrickson's Cross-Claim. (Doc. 62)

## II.   Legal Standards

### A.   Judgment on the Pleadings

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion for judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim, which means that the same legal standard "applies to motions brought under either rule." *Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1062 n. 4 (9th Cir. 2011).

5

"'A judgment on the pleadings is properly granted when, taking all allegations in the pleading as true, [a] party is entitled to judgment as a matter of law.'" *Lyon v. Chase Bank USA, N.A.* 656 F.3d 877, 883 (9th Cir. 2011), quoting *Dunlap v. Credit Prot. Ass'n, L.P.*, 419 F.3d 1011, 1012 n. 1 (9th Cir. 2005). "Not only must the court accept all material allegations in the complaint as true, but the complaint must be construed, and all doubts resolved, in the light most favorable to the" nonmoving party. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988). As a result, a party is not entitled to judgment on the pleadings if the nonmoving party's answer raises issues of fact or affirmative defenses that, if proven, would defeat recovery. *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregation*, 887 F.2d 228, 230 (9th Cir. 1989)); *Tawfilis v. Allergan, Inc.*, 2016 WL 3919488, at *2 (C.D. Cal. May 31, 2016); *Pit River Tribe v. Bureau of Land Management*, 793 F.3d 1147, 1159 (9th Cir. 2015).

As a general rule, a court may not consider materials outside the pleadings when evaluating a Rule 12(c) motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). Nevertheless, the court may consider "material which is properly submitted as part of the complaint." *Hal Roach Studios*, 896 F.2d at 1555 n. 19. In addition, the court may consider materials not physically attached to the pleadings if the complaint necessarily relies

6

on those materials and their authenticity is not in question. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Electronic Materials, Inc.*, 2007 WL 2318903 at *7 (N.D. Cal. Aug. 13, 2007). Finally, the court "may take judicial notice of matters of public record." *Lee*, 205 F.3d at 688-89.

### B.    Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324

(1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

When presented with cross-motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the non-moving party the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

### C. Application of Montana Law

Where, as here, a declaratory judgment action is in federal court based on diversity jurisdiction, the propriety of granting declaratory relief is a procedural matter to which federal law applies but the underlying substantive issues are governed by state law. *Paul Evert's RV Country, Inc. v. Universal Underwriters Ins. Co*., 2016 WL 3277175, *2 (E.D. Cal. June 14, 2016) (citing *Golden Eagle Ins. Co. v. Travelers Cos*., 103 F.3d 750, 752 (9th Cir. 1996), overruled on other grounds by *Govt. Employees Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998)).

Thus, the Court applies Montana law to all substantive legal issues. See *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

### 1.    Insurance Policy Interpretation

It is well-settled in Montana that the interpretation of an insurance contract presents a question of law. *Scentry Biologicals, Inc. v. Mid-Continent Cas. Co.*, 319 P.3d 1260, ¶ 25 (Mont. 2014). A court interpreting an insurance policy is to read the policy as a whole and, to the extent possible, reconcile the policy's various parts to give each meaning and effect. *Kilby Butte Colony, Inc v. State Farm Mut. Auto. Ins. Co.*, 403 P.3d 664, ¶ 10 (Mont. 2017). The court must interpret the terms of the "insurance policy according to their usual, common sense meaning as viewed from the perspective of a reasonable consumer of insurance products." *Allstate Ins. Co. v. Wagner-Ellsworth*, 188 P.3d 1042, ¶ 16 (Mont. 2008) (quoting *Stutzman v. Safeco Ins. Co. of America*, 945 P.2d 32, 34 (Mont. 1997)).  In doing so, the court "may not rewrite the contract at issue, but must enforce it as written if its language is clear and explicit." *Allstate Ins. Co.*, at ¶ 16.     If the terms of an insurance policy are ambiguous, however, that ambiguity  must be strictly construed against the insurer. *Stutzman*, 945 P.2d at 34. "An '[a]mbiguity exists only when the contract taken as a whole or in its wording or phraseology is

reasonably subject to two different interpretations.'" *Farmers Alliance Mut. Ins. Co. v. Holeman*, 961 P.2d 114, ¶ 25 (Mont. 1998).

      2.    Duty to Defend

Under Montana law, "[t]he duty to defend is independent from and broader than the duty to indemnify created by the same insurance contract." *United National Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 214 P.3d 1260, 1269 (Mont. 2008). The duty to defend "arises when an insured sets forth facts that represent a risk covered by the terms of an insurance policy." *United National*, 214 P.3d at 1269. In other words, where the insured "alleges facts, which if proven, would result in coverage," then the insurer has a duty to defend. *Plum Creek Marketing, Inc. v. American Economy Ins. Co.*, 214 P.3d 1238, 1247 (Mont. 2009). While the duty to defend thus "arises where the alleged facts even potentially fall within the scope of coverage,...the duty to indemnify does not arise unless the policy actually covers the alleged harm." *Skinner v. Allstate Ins. Co.*, 127 P.3d 359, 363 (Mont. 2005) (quoting *Constitution Assocs. v. New Hampshire Ins. Co.*, 930 P.2d 556, 562-63 (Colo. 1996)).

## III.  **Discussion**

Hanover moves for summary judgment on the grounds that: (1) Hendrickson and Sweeney are not covered under the primary coverage provisions of the Hanover Policy because the TGC claim was not made and reported during the

policy period; (2) Sweeney is not covered under the ERP Endorsement because the TGC claim was made prior to the ERP Endorsement effective date; (3) the Aspen Policy likely provides coverage for the TGC claim, thereby terminating any coverage that Sweeney may otherwise have had under the ERP Endorsement; (4) Aspen has waived its right to refuse to defend Hendrickson and Sweeney; and (5) if the Hanover Policy affords any coverage, it excess to the coverage provided by the Aspen Policy.

Aspen, in turn, argues it is entitled to summary judgment because there is no potential for coverage under the Aspen Policy, which means it has no obligation to defend or indemnify Hendrickson or Sweeney in connection with the TGC claim. In particular, Aspen maintains there is no potential for coverage under the Aspen Policy because the TGC claim falls outside the Aspen Policy's insuring agreement, and Hendrickson failed to disclose the potential malpractice claim on the Aspen Policy application.

In their cross-motion for summary judgment against Hanover, Hendrickson and Sweeney argue there is coverage under the Hanover Policy because the TGC claim was made and reported in accordance with the terms of the Hanover Policy and the ERP Endorsement's unlimited reporting period. Alternatively, Hendrickson and Sweeney argue that even if the TGC claim was not timely reported, coverage is not precluded under Montana's notice-prejudice rule.

11

Finally, TGC moves for partial judgment on the pleadings, asking the Court to rule as a matter of law that: (1) the TGC claim was made and reported in accordance with the Hanover Policy and ERP Endorsement, and; (2) coverage for the underlying claim is in no way barred or excluded by the Hanover Policy language. (Doc. 45 at 7).[1] As TGC makes clear in its reply brief, however, its motion is limited to the issue of whether the underlying claim was made and reported in accordance with the terms of the Hanover Policy. TGC is not seeking judgment as matter of law on the issue of whether, as Hanover maintains in defense of TGC's counterclaim and in support of its motion for summary judgment, that coverage is barred by the "other insurance" provision in the ERP Endorsement.

Whether it is permissible for a party to seek partial judgment on the pleadings as to less than an entire cause of action is not entirely clear. A number of courts in the Ninth Circuit "have refused to entertain motions for judgment on the pleadings that seek to dispose of only a part of an individual claim or defense." See e.g. *Erhart v. Bofi Holding, Inc.*, 387 F.Supp.3d 1046, 1063 (S.D. Cal. 2019)

---

[1] Hendrickson and Sweeney endorse TGC's motion, but make clear for the record that Sweeney disputes TGC's allegation that he committed malpractice. (Doc. 46). Likewise, Aspen does not oppose TGC's motion and supports TGC's position that the Hanover Policy provides coverage for the claims against Hendrickson and Sweeney. (Doc. 47).

(citing *United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave., Berkeley, Cal.,* 2013 WL 6774082, at *1 (N.D. Cal. 23, 2013) ). Nevertheless, because TGC's motion for partial judgment on the pleadings comes before the Court in the context of several dispositive motions for summary judgment, the Court will consider TGC's motion on the merits as part of the discussion below.

### A.   Hanover Policy

Hanover argues the Hanover Policy does not provide coverage for TGC's underlying malpractice claim for the following reasons: (1) Hendrickson and Sweeney are not covered under the primary coverage provisions of the Hanover Policy because the TGC claim was not made and reported during the policy period; (2) Sweeney is not covered under the ERP Endorsement because the TGC claim was made prior to the ERP Endorsement effective date, and; (3) the Aspen Policy provides coverage for the TGC claim, thereby terminating any coverage Sweeney may otherwise have had under the ERP Endorsement's "other insurance" provision.

### 1.   Hanover Policy Provisions

The Hanover Policy is a Lawyers Professional Liability Policy with effective dates from July 1, 2016 to July 1, 2017, and a retroactive date of July 1, 1985.

(Doc. 2 at 14). The Hanover Policy is a claims-made and reported policy, as

described in its opening paragraph:

> **This is a CLAIMS-MADE AND REPORTED policy. Subject to the terms, conditions, exclusions and limitations of this policy, coverage is limited to liability for only those claims that are first made against you and reported to us in writing after the retroactive date and during the policy period or any optional extended reporting period, if exercised by you.**

(Doc. 2 at 18).

The Hanover Policy's Professional Services Coverage provision reads as

follows:

> **We** will pay on **your** behalf those sums which you become legally obligated to pay as **damages** and **claim expenses** because of any **claim** made against you arising from a **wrongful act** in the rendering of or failure to render **professional services**, provided that:
>
>     a.    The **wrongful act** must have first occurred on or after the applicable **retroactive date(s)**;
>
>     b.    **You** had no knowledge of facts which could reasonably have caused **you** to foresee a **claim**, or any knowledge of the **claim**, prior to the effective date of this **policy**; and,
>
>     c.    The **claim** or **potential claim** must first be made and reported to **us** in writing during the **policy period** or any **extended reporting period**, if applicable, and must arise from any **wrongful act** to which this **policy** applies.

(Doc. 2 at 19).

Relevant here, the Hanover Policy defines a "claim" to mean:

14

1.      A demand for suit or money services **you** receive, including any
        arbitrations proceedings to which **you** are required to submit or to
        which **you** have submitted with **our** consent;

2.      When **you** first receive oral or written information or have knowledge
        of specific circumstances involving a particular person or entity which
        could reasonably be expected to result in a demand or suit for money
        or services, including but not limited to when **you** first receive oral an
        oral or written request to notify **us** of a **potential claim**; or

3.      When **you** first receive oral or written notification of any **disciplinary
        proceeding**.

(Doc. 2 at 20).

In addition, the Hanover Policy contains the following notice provision:

1.      **NOTICE OF CLAIM OR DISCIPLINARY PROCEEDING**

        a.      If **you** receive notice of a **claim** or **disciplinary proceeding**,
                **you** and any other involved **insured(s)** must provide to **us**
                written notice of the **claim** or **disciplinary proceeding**, with
                full details, including the date received, the claimant's name
                and address, the dates and nature of retention, and the alleged
                **wrongful act** as soon as practicable, but in no event later than
                sixty (60) days after such **claim** or **disciplinary proceeding** is
                first made.

(Doc. 2 at 25).

The Hanover Policy also provides for an automatic extended reporting

period, as follows:

**AUTOMATIC EXTENDED REPORTING PERIOD.**

**You** will be entitled to an automatic **extended reporting period** for no
additional premium. This extension is applicable to any **claim** made against
**you** during the **policy period** and reported to **us** in writing during the sixty
(60) days immediately following the **policy termination date**. This

15

automatic **extended reporting period** applies only to **SECTION A.1.
Professional Services Coverage.**

(Doc. 2 at 24).

In addition, the Hanover Policy provides for a retirement extended period, as

follows:

### RETIREMENT EXTENDED REPORTING PERIOD

If **you** have retired completely from the practice of law, been continuously
insured with **us** for the immediately preceding three (3) years, and have
reached the age of 55, **we** will issue an **extended reporting period**
endorsement of unlimited duration without cost to you.

(Doc. 2 at 25).

There is no dispute that the legal malpractice claim alleged by TGC in the

underlying action constitutes a "wrongful act" as required by the Hanover Policy's

basic insuring agreement. Rather, the dispute between the parties centers on

whether TGC's claim was made and reported in accordance with the terms and

requirements of the Hanover Policy and/or the ERP Endorsement.

> 2.    Whether Hendrickson and Sweeney are covered for the TGC
>        claim under the primary coverage of the Hanover Policy

Hanover first argues that Hendrickson and Sweeney are not covered under

the primary coverage of the Hanover Policy because the TGC claim was not made

and reported during the policy period or automatic extended reporting period

("automatic ERP"). Hanover focuses on the Hanover Policy's opening paragraph,

which limits coverage "to liability for only those claims that are first made against

16

you *and* reported to us in writing after the retroactive date and during the policy

period or any optional extended reporting period, if exercised by you." (Doc. 2 at

18) (emphasis added). Noting the conjunctive use of "and" in this sentence,

Hanover argues the Hanover Policy requires that a claim be made *and* reported

during the policy period, which in this case was from July 1, 2016 to July 1, 2017.

Hanover further argues that the TGC claim was first made on February 10, 2017,

when Sweeney e-mailed TGC's representative acknowledging that he had not

timely filed the UCC statements and that his failure to do so likely constituted

malpractice. (Doc. 64, at 5, ¶ 13).  The entire text of Sweeney's email is as follows:

> Jim: It appears that my failure to timely file UCC statements on behalf of
> TGC at the time of the loan in 2013 is going to potentially cause a problem
> for TGC to be in second position in collection of tis loan to the Vanity
> entities. Please see attached letter. This may mean that TGC will not be in a
> secured second space if everything is not taken by Wells Fargo, and that
> TGC will be deemed to be an unsecured creditor which gets a small piece of
> the assets not taken by Wells Fargo.
>
> If Wells Fargo does not take everything, and TGC would otherwise take a
> larger share, then this appears to be a clear case of malpractice. Please advise
> if you wish for me to contact my malpractice carrier and put them on notice
> about this potential claim.

(Doc 64 at 5, ¶ 13).  Hanover argues this e-mail constitutes a claim under

subsection (2) of the Hanover Policy's definition because it shows that Sweeney

and Hendrickson "first received oral or written information or ha[d] knowledge of

specific circumstances involving a particular person or entity which could

17

reasonably expected to result in a demand or suit for money or services" no later than February 10, 2017. Thus, Hanover argues that the TGC claim was first made no later than February 10, 2017. Assuming Hanover is correct, the Hanover Policy's notice provision required Hendrickson and Sweeney to notify Hanover of the claim no later than (60) days after February 10, 2017. It is undisputed that Hendrickson and Sweeney did not give Hanover notice of the TGC claim until December 2, 2019 - far more than sixty days later.

As Hanover notes, the Hanover Policy also provided an automatic ERP "applicable to any claim made against you during the policy period and reported to us in writing during the sixty (60) days immediately following the policy termination date." (Doc. 2 at 25) (bold omitted). Because the TGC claim was made no later than February 10, 2017, Hanover argues, this automatic ERP does not apply. But even if it did, Hanover points out that the Hanover Policy terminated on July 1, 2017 and Hendrickson and Sweeney did not report the TGC claim until December 2, 2019 -- long after the end of the 60-day automatic ERP. Because the TGC claim was not both made and reported during the policy period or automatic ERP, Hanover maintains neither Hendrickson nor Sweeney are covered for the TGC claim.

TGC, Hendrickson, and Sweeney agree that TGC claim was first reported to Hanover on December 2, 2019, but disagree with Hanover's argument that the TGC claim was first made in February 2017 during the Hanover Policy period.

      a.     *Whether Hanover is precluded from contending that the TGC claim was made in February 2017*

To begin with, TGC argues based on the allegations in the pleadings that Hanover is precluded from taking the position that the TGC claim was first made in February 2017. In its counterclaim against Hanover, TGC alleges that it "made a claim for malpractice in September 2019, when its attorneys [] sent a letter to Sweeney and Hendrickson demanding they contact their insurance company and resolve the claim without litigation."[2] (Doc. 7 at 16, ¶ 23). TGC and Hanover both allege in their respective pleadings that the TGC claim was first reported to Hanover in December 2019. (Doc. 2 at 5, ¶26; Doc. 7 at 16, ¶ 24). Taking these allegations as true, TGC maintains the claim against Sweeney was "first made" in September 2019 and "first reported" in December 2019 – both within the ERP Endorsement's extended reporting period, which began on June 30, 2017 and is of unlimited duration.

---

[2] In its answer to TGC's counterclaim, Hanover stated that it lacked sufficient information to admit or deny this allegation, and so denied the allegation "for proof at trial." (Doc. 19 at ¶ 23).

According to Hanover, however, if the allegations in its Amended Complaint are taken as true, the underlying claim was "first made" before the extended reporting effective date of June 30, 2017, thereby rendering the ERP Endorsement inapplicable. In its Amended Complaint, Hanover specifically alleges that "[f]or purposes of the Hanover policy, the claim was 'first made' no later than February 10, 2017," which is the date of Sweeney's email acknowledging that his failure to timely file the requisite UCC financing statements constituted malpractice.  (Doc. 2 at 5, ¶ 22).

TGC argues Hanover cannot rely on this allegation to defeat partial judgment on the pleadings because it admitted the exact opposite in its answer to TGC's counterclaim. In particular, Hanover admitted the following allegation: "For purposes of the Policy, no claim was made at the time of the February 10, 2017 email Sweeney sent TGC. At that time TGC did not assert a claim against Sweeney." (Doc. 7, at 16 ¶ 22; Doc. 19, at 9, ¶ 22). In light of this admission, and taking the remaining allegations in the pleadings as true, TGC asks the Court to find that no claim was made for purposes of the Hanover Policy until September 2019.

It is well-established that a statement in a pleading may constitute a judicial admission, which has "the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *American Title Inc. Co. v. Lacelaw*

*Corp.*, 861 F.2d 224, 226 (9ᵗʰ Cir 1988). "To qualify as a judicial admission, the admission must be 'deliberate, clear, and unequivocal.'" *In re Twitter, Inv. Securities Litigation*, 2020 WL 5904407, at *1 (N.D. Cal. Oct. 6, 2020) (citing *Truckstop.net, L.LC. v. Sprint Commc'ns Co.*, 537 F.Supp.2d 1126, 1135 (D. Idaho 2008)). Where "the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight. *Sicor Ltd. v. Cetus crop.*, 51 F.3d 848, 859-60 (9ᵗʰ Cir. 1995).

Here, Hanover explains that because the allegations in TGC's counterclaim were directed to Hanover as the answering party, it assumed the allegations in paragraph 22 "were directed at whether a claim was made and reported to Hanover as opposed to whether the claim was made to Sweeney." (Doc. 48 at 8). Particularly in light of the contradictory allegations in paragraph 22 of Hanover's Amended Complaint, the Court finds that its admission to the allegations in paragraph 22 of TGC's counterclaim is not deliberate, clear, and unequivocal as required for it to constitute a judicial admission. Accordingly, under the circumstances, the Court declines to take Hanover's statement in its answer to TGC's counterclaim as a binding judicial admission.

                    b.      *Whether the TGC Claim was made in February 2017 during the Hanover Policy period*

21

TGC next maintains that Sweeney's email demonstrating that he was aware of his own apparent malpractice does not meet the definition of a "claim" under the Hanover Policy. Rather, TGC argues that Sweeney's awareness of his own malpractice was simply a "potential claim" and so not subject to the strict 60-day notice requirement applicable to "claims." The Hanover Policy defines a "potential claim" as "any wrongful act or any facts or other circumstances which may subsequently give rise to a claim." (Doc. 2 at 22) (bold omitted). An insured must provide Hanover with written notice of a potential claim "as soon as practicable…but in any event not later than the end of the policy period or any extended reporting period, if applicable." (Doc. 2 at 25). TGC argues the applicable extended reporting period here is set forth in the ERP Endorsement, which has an effective date of June 30, 2017 and no expiration date. Given the unlimited duration of the ERP Endorsement, TGC contends notice of the "potential claim" was timely.

Contrary to TGC's argument, however, the content of Sweeney's February 10, 2017 email plainly satisfies the Hanover Policy's definition of a "claim" as set forth in subsection (2) because it unequivocally shows Sweeney "had knowledge of specific circumstances involving a particular person or entity which could reasonably be expected to result in a demand or suit for money or services." (Doc. 2 at 20). Even Hendrickson and Sweeney agree on this point, conceding as they do

that Sweeney's actual knowledge in early 2017 fits the Hanover Policy's definition of "claim." (Doc. 58, at 7).

In addition, even assuming there was only a "potential claim" in February 2017, the ERP Endorsement and the notice provisions set forth therein apply only to Sweeney. Thus, for purposes of the Hendrickson law firm, the applicable "extended reporting period" referenced in the notice requirement for potential claims necessarily refers to the 60-day automatic extended reporting period of the general Hanover Policy, and does not allow Hendrickson to report a claim during Sweeney's individual extended reporting period.

While Hendrickson and Sweeney agree that a claim *existed* in February 2017, they argue no claim was *made* against Sweeney until September 19, 2019, when TGC's counsel sent a letter to Sweeney and Hendrickson advising them that TGC held a claim for legal malpractice against them, and requesting they tender the claim their insurance carrier. (Doc. 64-1 at 17). However, Hendrickson and Sweeney do not cite any authority to support their argument. (Doc. 58 at 7). Notably, the Hanover Policy does not provide a separate definition for what it means to "make" a claim, or otherwise differentiate between the existence and making of a claim against an insured.

"The Montana Supreme Court has recognized that a claim can arise under an insurance policy before a lawsuit is actually filed." *Capitol Specialty Ins. Corp. v.*

*Big Sky Diagnostic Imaging, LLC*, 2019 WL 1245642, at *5 (D. Mont. Jan. 30, 2019) (citing *Herron v. Schutz Foss Architects*, 935 P.2d 1104, 1108 (Mont. 1997)) *aff'd* 845 Fed. Appx. 618 (9th Cir. Apr. 21, 2021). Consistent with this accepted premise, Hanover relies on 14 Couch on Insurance 3d § 199:133 for the proposition that a claim is made for purposes of an insurance policy when the definition of a claim under the policy is satisfied.

This section of Couch on Insurance recognizes that the notice requirement in a claims-made policy may turn on whether a claim has been made, and cites to *Schleusner v. Continental Casualty Co.*, 102 F.Supp.3d 1148 (D. Mont. 2015). Applying Montana law, *Schleusner* held that because the policy at issue defined a "claim" as an oral or written demand received by an insured for money or services, a claim was made against an insured real estate company when it received notice of the underlying lawsuit rather than when the underlying lawsuit was initially filed. *Schleusner*, 102 F.Supp.3d at 1152. *Schleusner* thus supports Hanover's argument that a claim is made for purposes of a claims-made insurance policy when the policy's definition of "claim" is satisfied.  See also *Capitol Specialty*, 2019 WL 1245642 at *5 (finding that initiation of Montana Medical Legal Panel proceedings constituted the making of a claim under a policy that defined a claim to include "any circumstance which is likely to result in a demand for damages").

24

As set forth above, the Hanover Policy defines a claim to mean "[w]hen you first …have knowledge of specific circumstances involving a particular person or entity which could reasonably be expected to result in a demand or suit for money or services." (Doc. 2 at 20). As demonstrated by the content of his email to TGC's representative, Sweeney first had knowledge of specific circumstances involving TGC that could reasonably be expected to result in a demand or suit no later than February 10, 2017. Thus, a claim was made under the Hanover Policy at that time.

Although the TGC claim was first made in February 2017, Hendrickson and Sweeney did not provide Hanover with notice of the TGC claim until December 2019 – long after the expiration of the policy period on July 1, 2017.  As Hendrickson and Sweeney conceded at oral argument, this means that the Hendrickson firm itself is not covered for the TGC claim under the primary coverage of the Hanover Policy.

Focusing instead on Sweeney, Hendrickson and Sweeney argue he is covered under the plain terms of the Retirement Extended Reporting Period as set forth in the body of the Hanover Policy. Paragraph 4 of the Extended Reporting Period section of the Hanover Policy states:

## 4.    RETIREMENT EXTENDED REPORTING PERIOD

If **you** have retired completely from the practice of law, been continuously insured with **us** for the immediately preceding three (3) years, and have reached the age of 55, **we** will issue an **extended reporting period** endorsement of unlimited duration without cost to you.

(Doc. 2 at 25).

Hendrickson and Sweeney argue that Sweeney's rights under the Hanover
Policy begin and end with paragraph 4, which they maintain unambiguously
demonstrates that Sweeney bargained for and received a promise from Hanover
that when he retired he would have tail coverage with an unlimited reporting
period. Thus, Hendrickson and Sweeney maintain that even if the TGC claim was
first made in February 2017, Sweeney had an unlimited period of time within
which to report the claim to Hanover and is therefore covered for the TGC claim.

As discussed below, however, the ERP Endorsement to which paragraph 4
refers identifies specific prerequisites for coverage, including for example the
requirement that "[c]laims must first be made and first reported to us after the
individual extended reporting period effective date and prior to the individual
extended reporting period expiration date shown below." (Doc. 2, at 32).
According to Hendrickson and Sweeney, however, there is no need to even
consider the terms of the ERP Endorsement. They maintain that Sweeney is
unambiguously covered for the TGC claim in light of the unlimited extended
reporting period promised in paragraph 4, and the ERP Endorsement cannot
enlarge or diminish the parties' rights under the main policy provisions.

For support, Hendrickson and Sweeny rely on the following excerpt from a
decades-old case out of the Court of Civil Appeals of Texas:

26

> It would then appear that insured was, at the time of the exchange, an
> unacceptable risk and the insurer issued only that coverage that it was bound
> to issue under the fixed conditions in the prior term rider, evidencing that it
> was not contemplated that either party was required to enlarge its obligations
> or diminish its rights under the latter policy issued pursuant to the basic
> agreement.

*Occidental Life Ins. Co. of N. Carolina v. Hurley*, 513 S.W.2d 897, 900 (Tex. Civ.

App. 1974). Hendrickson and Sweeny also rely on the same quote from

*Commonwealth Life Ins. Co. v. Jackson*, 432 N.E.2d 1382, 1390 (Ind. Ct. App.

1982) (quoting *Occidental Life Ins.*, 513 S.W. 2d at 900). (Doc. 58 at 6).

The Court does not find these excerpts to be particularly persuasive or

helpful. They say nothing about whether an insurer can do what Hanover has done

here, namely, refer in the policy to possible extended reporting period endorsement

coverage and then set forth the terms and conditions of that coverage in the

endorsement itself.

As is commonly the case with insurance policy endorsements in Montana,

the ERP Endorsement at issue here begins with the following prefatory statement:

"THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT

CAREFULLY." Consistent with paragraph 4's reference to a retirement extended

reporting period "of unlimited duration" (Doc. 2, at 25), the ERP Endorsement

states that its expiration date is "unlimited." (Doc. 2, at 32). The ERP Endorsement

then specifies the terms and conditions of the extended reporting period coverage

referenced in paragraph 4, including, for example, the requirement that "[c]laims

27

must first be made and first reported to us after the individual extended reporting

period effective date and prior to the individual extended reporting period

expiration date shown below." (Doc. 2, at 32). Hendrickson and Sweeney provide

no persuasive authority for their argument that paragraph 4 of the Hanover Policy

must be read in isolation without resort to the attached endorsement. Rather, the

Court must interpret the Hanover Policy, including the ERP Endorsement, as a

whole and reconcile the policy's various parts to give each meaning and effect.

*Kilby Butte Colony, Inc.*, 403 P.3d 664, ¶ 10. Thus, the Court turns next to the

question of whether Sweeney is covered for the TGC claim under the ERP

Endorsement.

3.  <u>Whether Sweeney is covered for the TGC claim under the ERP
    Endorsement</u>

Hanover further argues that Sweeney is not covered for the TGC claim

under the ERP Endorsement, which provides in relevant part:

> This endorsement applies only to **your wrongful acts** that occurred on or
> after the **retroactive date** shown in the Declarations and before the
> individual **extended reporting period** effective date shown below. **Claims**
> must first be made and first reported to **us** after the individual **extended
> reporting period** effective date and prior to the individual **extended
> reporting period** expiration date shown below. …

(Doc. 2 at 32). As required in the first sentence quoted above, the wrongful act

alleged here, Sweeney's malpractice, occurred sometime in 2013 – after the

retroactive date of July 1, 1985 shown in the declarations and before the ERP

Endorsement's effective date of June 30, 2017. (Doc. 2 at 32). As Hanover reads the next sentence, however, the ERP Endorsement clearly applies only to claims that are first made after the ERP Endorsement effective date. Because the TGC claim was made no later than February 10, 2017, Hanover contends, it was first made nearly five months before the ERP Endorsement's effective date and thus there is no coverage.

TGC disagrees, and argues that the ERP Endorsement must be read in conjunction with the primary coverage provisions of the Hanover Policy. Even assuming the TGC claim was first made in February 2017, TGC argues the Hanover Policy language allows a claim to be first made during the policy period and first reported during the ERP Endorsement's unlimited extended period.

With respect to when a claim must be made and reported to qualify for coverage, the Hanover Policy states at the outset that "coverage is limited to liability for only those claims that are first made against you and reported to us in writing after the retroactive date and during the policy period or any optional extended reporting period, if exercised by you." (Doc. 2 at 18). The Hanover Policy's professional services coverage provision similarly provides, in relevant part, that "[t]he claim or potential claim must first be made and reported to us in writing during the policy period or any extended reporting period, if applicable, and must arise from any wrongful act to which this policy applies." (Doc. 2 at 18).

29

Like Hendrickson and Sweeney, TGC argues this policy language clearly extends tail coverage to Sweeney for claims that are first made during the policy period and first reported during any applicable extended reporting period, including in particular the ERP Endorsement. Focusing on the disjunctive use of "or" in the Hanover Policy's opening paragraph and professional services coverage provision, TGC maintains "both the making and reporting of claims can occur in or another period – either the policy period or any applicable extended reporting period," including the ERP Endorsement. (Doc. 65, at 12).

The Court finds this argument is foreclosed by the plain language of the ERP Endorsement. Unlike the Hanover Policy's general coverage provisions, the ERP Endorsement does not use the term "or", and instead specifies that "Claims must first be made and first reported to us after the individual extended reporting period effective date and prior to the individual extended reporting period expiration date shown below." (Doc. 2 at 32) (bold omitted). The language of the ERP Endorsement is easily reconciled with the language of the Hanover Policy's opening paragraph and professional services coverage provision, which is reasonably read as requiring that a claim must first be made against the insured and reported to Hanover during the policy period or applicable automatic 60-day extended reporting period.

Although the ERP Endorsement does not specify that a claim must be "made against you," the insured, there is no other reasonable way to interpret this requirement when reading the Hanover Policy as a whole.  For example, the Hanover Policy's professional services coverage provision specifies that Hanover "will pay on your behalf those sums which you become legally obligated to pay as damages and claim expenses because of any claim *made against you* arising from a wrongful act in the rendering of or failure to render professional services…" (Doc. 2 at 18) (bold omitted; italics added for emphasis). Likewise, the Hanover Policy defines a "claim" to mean:

1.    A demand or suit for money or services *you receive*, including any arbitration proceedings to which you are required to submit or to which you have submitted with our consent;

2.    When *you first receive* oral or written information or have knowledge of specific circumstances involving a particular person or entity which could reasonably be r expected to result in a demand or suit for money or services, including but not limited to when *you first receive* oral or written request to notify u**s** of a potential claim; or

3.    When *you first receive* oral or written notification of any disciplinary proceeding.

(Doc. 2 at 20) (bold omitted; italics added for emphasis). As these provisions make clear, for a claim to be covered under the Hanover Policy it must be made against the insured.

Accordingly, and reading the Hanover Policy as a whole so as to give meaning and effect to all parts, the coverage afforded Sweeney under the ERP

31

Endorsement is plainly limited to claims first made and first reported to Hanover "after the individual extended reporting period effective date and prior to the individual extended reporting period expiration date shown below." (Doc. 2 at 32) (bold omitted). The ERP Endorsement's individual extended reporting period effective date is June 30, 2017, and its expiration date is "unlimited." (Doc. 2 at 32). As discussed above, the TGC claim was first made in February 2017 during the policy period. It is undisputed that the TGC claim was first reported to Hanover in December 2019. Because the TGC claim was first made prior to the ERP Endorsement's effective date of June 30, 2017, Sweeney is not covered under the ERP Endorsement.

### 4.   Whether the notice-prejudice rule applies

Finally, Hendrickson, Sweeney, and TGC argue that even if the TGC Claim was not timely reported to Hanover, coverage is not precluded under Montana's notice-prejudice rule. The notice-prejudice rule "provides that late notice of a claim (i.e., notice outside the time limit established in the written insurance policy) will not preclude coverage unless the insurer can demonstrate that it was prejudiced by the lateness of the notice." *Estate of Gleason v. Central United Life Inc. Co.,* 350 P.3d 349, 354 (Mont. 2015). The Montana Supreme Court has held that the notice-prejudice rule applies to occurrence policies. *Gleason*, 350 P.3d at 354; *Atlantic Cas. Ins. Co. v. Greytak*, 350 P.3d 63, 64 (Mont. 2015).

32

Although the Montana Supreme Court has not directly addressed whether the notice-prejudice rule also applies to claims-made policies, the court in *Capitol Specialty Ins. Corp. v. Big Sky Diagnostic Imaging, LLC.,* 2019 WL 1245642, at *6-8 (D. Mont. Jan. 30, 2019), *aff'd*, 845 Fed. Appx. 618 (9th Cir. Apr. 21, 2021) has persuasively predicted that the Montana Supreme Court would likely follow the majority view and hold that the notice-prejudice rule does not apply to claims-made policies, including claims-made-and-reported policies.

Hendrickson and Sweeney do not take issue with the reasoning in *Capitol Specialty*, and agree that the "working assumption…is that Montana would not apply the Notice-Prejudice Rule to claims made policies." (Doc. 58 at 8). Instead, Hendrickson and Sweeney argue that the Hanover Policy is actually "an occurrence policy or so close to being an occurrence policy" that the notice-prejudice rule applies. (Doc. 58 at 9).  Although the Hanover Policy expressly states that it is a "**CLAIMS-MADE AND REPORTED** policy" (Doc. 2 at 18), Hendrickson and Sweeney nevertheless argue the Hanover Policy is actually an occurrence-based policy because it broadly defines a claim to include "When you first…have knowledge of specific circumstances involving a particular person or entity which could reasonably be expected to result in a demand or suit for money or services…" (Doc. 2 at 20).  The Court does not find this argument persuasive.

33

Claims-made policies "have become the most common means for insuring against professional malpractice." 1 Couch on Insurance 3d § 1:5. The Hanover Policy is a professional legal malpractice insurance policy, which expressly limits coverage "to liability for only those claims are first made against you and reported to us" within certain deadlines. (Doc. 2 at 18).  Such claims made and reporting requirements are not are not found in occurrence-based policies, which typically provide coverage "if the damages or injury from a negligent or omitted act occurred during the period of the policy, regardless of the date a claim is actually made against the insured." 1 Couch on Insurance 3d § 1:5.  Thus, the mere fact that the Hanover Policy broadly defines a claim to include when the insured first has knowledge of specific circumstances that "could reasonably be expected to result in a demand or suit for money or services" does not mean that it is an occurrence-based policy. (Doc. 2 at 20). See *Capitol Specialty*, 2109 WL 1245642 at *2, 7-8 (concluding that notice-prejudice rule did not apply to a claims-made-and-reported professional liability policy that similarly defined a claim to include "any circumstance which is likely to result in a demand for damages").

Hendrickson and Sweeney further maintain that the exception to the notice-prejudice rule for claims-made policies should not apply to a policy with an unlimited reporting period. (Doc. 58 at 9). In *Capitol Specialty*, the court reasoned that applying the notice-prejudice rule to a claims-made policy and allowing an

34

extension of the reporting time would, in effect, rewrite the contract between the parties and extend coverage the insurer did not intend to provide. *Capitol Specialty*, 2019 WL 1245642 at \*7. Hendrickson and Sweeney argue this reasoning does not apply here because "the extension of the reporting period is not being granted by the Court, but by the" Hanover Policy itself. (Doc. 58 at 10).

As discussed above, however, the primary coverage provisions of the Hanover Policy require that any claim made during the policy period be reported within 60 days or, at the latest, within 60 days of the policy's expiration date as provided in the automatic extended reporting period. The ERP Endorsement issued to Sweeney separately provides that for its tail coverage to apply, the claim must first be made and first reported after the ERP Endorsement effective date. Because the Hanover Policy and ERP Endorsement do not allow a claim to first be made during the policy period and then reported at any time thereafter, the reasoning of *Capitol Specialty* applies here.  As in *Capitol Specialty*, applying the notice-prejudice rule to the facts of this case would effectively rewrite the policy to extend coverage that Hanover did not intend to provide.

Like Hendrickson and Sweeney, TGC also argues the notice-prejudice rule should be applied here. TGC recognizes that courts have created an exception to the notice -prejudice rule for claims-made-and-reported policies, but maintains the exception does not apply if notice is given before the expiration of an applicable

extended reporting period. (Doc. 65 at 14). For support, TGC relies on the

Restatement of the Law -- Liability Insurance § 35, cmt. h, which states that "[t]he

notice-prejudice rule applies to claims reported to the insurer before the end of the

reporting period under the policy because the justifications for the claims-made-

and-reported exception to the notice-prejudice rule do not apply until that period is

over."  Because the ERP Endorsement has no expiration date and Hanover was

given notice of the TGC claim in December 2019, TGC argues notice was given

before the end of the applicable extended reporting period and the notice-prejudice

rule thus applies.  (Doc. 65 at 14-15).

This argument fails because, as explained above, the coverage available to

Sweeney under the ERP Endorsement is expressly limited to claims first made

after the ERP Endorsement's effective date of July 1, 2017. Because the TGC

claim was first made in February 2017, the extended reporting period provided for

in the ERP Endorsement does not apply to the facts of this case.

Accordingly, the Court concludes that the Hanover Policy and ERP

Endorsement do not provide coverage for either Hendrickson or Sweeney for the

TGC Claim.

Even if coverage for Sweeney under the ERP Endorsement is not barred for

the reasons set forth above, Hanover argues Sweeney is not covered under the ERP

Endorsement because there was other insurance in effect that "likely provides

36

coverage" for the TGC claim, namely, the Aspen Policy. Hanover further argues that Aspen waived it rights to refuse to defend Hendrickson and Sweeney. (Doc. 54 at 11).

> The ERP Endorsement provides in relevant part:
>
> [I]f there is other insurance in effect on or after **your** individual **extended reporting period** effective date which covers you for such liability or **claim**, then that other insurance will render this coverage inapplicable, even though the Limits of Liability of the other insurance may be inadequate to pay all **losses** or **claims**.

(Doc. 2 at 32). Whether there is coverage or a potential for coverage under the Aspen Policy, and whether Aspen waived its right to refuse to defend Hendrickson and Sweeney, is discussed below in conjunction with Aspen's cross-motion for summary judgment.

## B.    Aspen Policy

Aspen argues it is entitled to summary judgment on all claims against it because there is no potential for coverage under the Aspen Policy, which means it has no obligation to defend or indemnify Hendrickson or Sweeney in connection with the TGC claim.

### 1.    Aspen Policy Provisions

The Aspen Policy is a Lawyers Professional Liability Policy with effective from July 1, 2019 to July 1, 2020, and a retroactive date of July 1, 1985. (Doc. 8-2 at 2). The first policy issued by Aspen to Hendrickson took effect on July 1, 2017.

(Doc. 64 at ¶ 2). The Aspen Policy is a claims-made-and-reported policy that provides coverage for "those claims that are first made against the insured and reported in writing to the company during the policy period." (Doc. 8-2 at 2).

The Aspen Policy's insuring agreement identifies certain prerequisites to coverage and provides in relevant part as follows:

## I.   INSURING AGREEMENTS

### A.   Coverage

The **Company** will pay on behalf of the **Insured** all sums in excess of the deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** as a result of a **claim** first made against the **Insured** and reported in writing to the **Company** during the **policy period** or the **extended reporting period** (if applicable), by reason of an act or omission, including **personal injury**, in the performance of **professional services** by the **Insured** or by any person for whom the **Insured** is legally liable, provided that:

**1.**     No **Insured** had a basis to believe that any such act or omission, or **related act or omission**, might reasonably be expected to be the basis of a **claim** prior to:

**a.**     The inception date of the first policy issued and continuously renewed by the **Company**; or

**b.**     The dates the **Insured** first became a member or employee of the **Named Insured** or **predecessor firm**, whichever is later.

**2.**     Neither the act or omission nor any **related act or omission** occurred prior to the **retroactive date**, if applicable.

(Doc. 8-2 at 5).

The Aspen Policy defines a claim as:

**B.     Claim** means a demand for money or services, naming the **Insured**, arising out of an act or omission in the performance of **professional**

38

**services**. A **claim** also includes the service of suit, a request that an **Insured** waive a legal right or sign an agreement to toll a statute of limitations, or the institution of an arbitration proceeding against the **Insured**.

(Doc. 8-2 at 8).

2.   <u>Whether there is a potential for coverage under the Aspen Policy</u>

Hanover argues the Aspen Policy provides coverage here because the TGC claim was first made against Sweeney and reported in writing to Aspen during the Aspen Policy period, which ran from July 1, 2019 to July 1, 2020. Unlike the Hanover Policy's broad definition of "claim", the Aspen Policy requires either a demand for money or services; service of suit; a request that an insured waive a legal right or toll a statute of limitations; or the initiation of arbitration proceedings. Hanover argues, and Aspen agrees, that this definition of claim was not satisfied until September 19, 2019, when TGC's attorneys sent Sweeney and Hendrickson a letter providing "formal notice" that it held a claim for legal malpractice against them, and requesting they tender the claim to their insurance carrier. (Doc. 63 at 10 n. 1; Doc. 64-1 at 17). It is undisputed that Aspen was given written notice of the TGC claim on November 7, 2019. (Doc. 64 at 4, ¶ 9). Because the TGC claim was first made against Sweeney and first reported to Aspen during the policy period, Hanover argues the Aspen Policy provides coverage.

Aspen does not dispute that the TGC claim was first made and first reported during the Aspen Policy period, but maintains there is no potential for coverage

39

because (1) the TGC claim falls outside the Aspen Policy's insuring agreement, and (2) Hendrickson failed to disclose the potential malpractice claim on the Aspen Policy application.

The Aspen Policy's insuring agreement expressly conditions coverage on no insured having a basis to believe that any act or omission might reasonably be expected to be the basis of a claim prior to the inception date of the first policy issued and continuously renewed by Aspen. (Doc. 8-2 at 5).

Aspen contends there is no potential coverage for TGC's claim against Hendrickson and Sweeney because, as alleged in the underlying state court complaint, Hendrickson and Sweeney had a basis to believe that Sweeney's acts or omissions might reasonably be expected to be the basis of a claim prior to July 1, 2017 – the inception date of the first policy issued and continuously renewed by Aspen.

TGC's state court complaint alleges that Sweeney and Hendrickson "failed to ensure that the appropriate UCC financing statements were prepared and filed" in connection with the line of credit transaction between TGC and Vanity. (Doc. 2 at 44, ¶ 17). The underlying complaint further alleges that Hendrickson and Sweeney did not file the UCC financing statements until February 2017, around which time:

> Sweeney expressly admitted to TGC that that it was "my failure" to timely file UCC financing statements on behalf of TGC. He acknowledged that

40

such failure would likely cause TGC to be an unsecured creditor in the Vanity Shop bankruptcy and would cause it to receive less than if it had been a second-position secured creditor. He further admitted that such failure to timely file UCC statements was a "clear case of malpractice."

(Doc. 2 at 44, ¶¶ 21, 22).

The evidence submitted on summary judgment confirms that these admissions occurred on or around February 10, 2017, when Sweeney emailed TGC's representatives stating, in relevant part:

It appears that my failure to timely file UCC statements on behalf of TGC at the time of the loan in 2013 is going to potentially cause a problem for TGC to be in second position in collection of its loan to the Vanity entities…this appears to be a clear case of malpractice. Please advise if you wish for me to contact my malpractice insurance carrier and put them on notice about this potential claim.

(Doc. 64 at 5, ¶ 13).

While the evidence submitted on summary judgment confirms the date of Sweeney's email, Hanover notes that the underlying complaint does not identify the exact date of the email. Thus, looking solely to the face of the underlying complaint, Hanover argues Aspen could not have known for certain whether it would be obligated to provide coverage and so had a duty to defend.

Aspen counters that Hanover's argument ignores the fact that under Montana law, an insurer is relieved of its duty to defend if the "complaint alleges facts that come within the coverage of the liability policy, but the insurer knows of other actual facts that *negate* coverage." *Revelation Industries, Inc. v. St. Paul Fire*

41

*& Marine Ins. Co.*, 206 P.3d 919, ¶ 22 (Mont. 2009) (emphasis in original). When

TGC provided "formal notice" of its legal malpractice claim to Hendrickson and

Sweeney on September 19, 2019, it quoted the February 10, 2017 email. (Doc. 64-

1, at 14-17). And when Hendrickson first reported the TGC claim to Aspen on

November 7, 2019, it provided TGC's September 19, 2019 letter to Aspen as part

of its tender and for Aspen's evaluation of coverage. (Doc. 64, at ¶ 9; Doc. 61, at ¶

29; Doc. 61-1, at 16-17).

Based on the allegations in the underlying complaint and the information

Hendrickson provided when tendering the defense, Aspen was aware of facts

demonstrating that as of February 2017 -- nearly five months before the July 1,

2017 inception date of the first policy issued by Aspen – Sweeney had a basis to

believe that an alleged act or omission might reasonably be expected to be the

basis of a claim. Because of this prior knowledge, Aspen argues, TGC's claim

against Hendrickson and Sweeny clearly falls outside the scope of the Aspen

Policy's insuring agreement and there is no potential for coverage. Absent any

potential for coverage, Aspen maintains it has no obligation to defend or indemnify

the TGC claim.

Aspen relies on the Montana Supreme Court's recent decision in *ALPS*

*Property & Casualty Ins. Co. v. Keller, Reynolds, Drake, Johnson & Gillespie,*

*P.C.*, 2021 MT 46, which addressed a professional liability insurer's duty to defend

or indemnify a law firm or any of its members for claims asserted in a malpractice

suits against the firm and three of its members. The malpractice claim in *ALPS*

arose from one attorney member's representation of a client in two related

lawsuits. *ALPS*, 2021 MT at ¶ 3. In one of the lawsuits, the attorney failed to file an

answer on behalf of the client, resulting in the entry of default against the client in

September 2015. *ALPS*, 2021 MT at ¶ 4. On November 30, 2015, the attorney filed

a motion to set aside the clerk's entry of default just ten minutes prior to the default

hearing. *ALPS*, 2021 MT at ¶ 4. When the court asked why the attorney would file

such a motion ten minutes prior to the hearing, the attorney stated he "had not paid

the necessary attention to the matter." *ALPS*, 2021 MT at ¶ 4. The court denied the

motion on March 1, 2016, and entered default judgment against the client for $2.2

million. *ALPS*, 2021 MT at ¶ 4.

ALPS insured the firm under a claims-made-and-reported policy with an

effective date of December 12, 2015. *ALPS*, 2021 MT at ¶ 6. The general coverage

provision of ALPS policy contained a prior knowledge provision stating that ALPS

"agrees to pay on behalf of the Insured all sums…that the Insured becomes legally

obligated to pay as Damages, arising from or in connection with a Claim first made

against the Insured and first reported to [ALPS] during the policy period, provided

that at the Effective Date of [the] Policy, *no insured knew or reasonably should*

*have known* or foreseen that the act, error, omission, or Personal Injury might be

43

the basis of a Claim….” *ALPS*, 2021 MT at ¶ 16 (emphasis in original). The

Montana Supreme Court characterized this prior knowledge provision as a

condition precedent to coverage, which indicated "in clear and unambiguous

language ALPS's 'unwillingness to cover liability arising from prior acts or

omissions that any insured might reasonably result in a claim'" *ALPS,* 2021 MT at

¶ 17 (quoting *Bryan Bros., Inc. v. Cont'l Cas. Co.*, 660 F.3d 825, 830-31 (4th Cir.

2011)). The Court concluded there was no coverage under the ALPS policy

because the undisputed facts demonstrated that prior to the December 12, 2015

effective date of the policy, the attorney knew or reasonably should have known

that his acts and omissions might be the basis of a malpractice claim. *ALPS,* 2021

MT at ¶ 19.

Here, as in *ALPS*, the prior knowledge provision in the Aspen Policy's basic

insuring agreement is a condition precedent to coverage. This prior knowledge

provision expressly conditions coverage on no insured having a basis to believe

that any act or omission might reasonably be expected to be the basis of a claim

prior to the inception date of the first policy issued and continuously renewed by

Aspen. (Doc. 8-2 at 5). As Sweeney's February 10, 2017 email demonstrates, he

had a basis to believe that an alleged act or omission might reasonably be expected

to be the basis of a claim nearly five months before the July 1, 2017 inception date

of the first policy issued by Aspen.

Hanover does not dispute that Sweeney had prior knowledge of the potential claim by TGC, but argues *ALPS* is factually distinguishable because Sweeney was retired at the time the first Aspen policy went into effect. The record reflects that Sweeney was retired as of June 30, 2017, and the first Aspen Policy issued to Hendrickson took effect on July 1, 2017. (Doc. 2 at 32; Doc. 64 at 4, ¶ 7). In contrast, Hanover notes that in *ALPS,* the attorney and every other member of the firm submitted a separate supplement at the time of the policy application "representing that he or she was not aware of and had no knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against him or her." *ALPS*, 2021 MT at ¶ 5.

Although there is no evidence that Sweeney submitted such a separate supplement, the Hendrickson firm affirmatively represented on the application for the first Aspen policy that, as of June 15, 2017 when the application was signed, no past or present personnel was aware of any act, error or omission which might become the basis of a claim against the firm. (Doc. 64-1 at 30). Specifically, Hendrickson answered "No" to the following question on the policy application: "After inquiry of all attorneys and staff of the Applicant, within the past 5 years have any past or present personnel…become aware of any act, error or omission or fee dispute which might become the basis of a claim against the Applicant or its personnel?" (Doc. 64-1 at 30).

Notwithstanding Hendrickson's representation on the Aspen Policy application, it is undisputed that Sweeney was aware that his failure to timely file the UCC statements might reasonably be expected to become the basis of a malpractice claim by TGC. Hendrickson and Sweeney do not argue otherwise in response to Aspen's motion for summary judgment on their cross-claim, and provide no reason why, under the circumstances, Sweeney's prior knowledge as an attorney member of the Hendrickson firm should not be imputed to the firm itself. (Doc. 77). Here, as in ALPS, the Aspen Policy's prior knowledge provisions unequivocally establish that a claim falls within the scope of coverage only if "no insured" had a basis to believe to believe that an act or omission might reasonably be expected to be the basis of a claim prior to the inception date of the policy. Notwithstanding Hanover's attempts to distinguish the facts in *ALPS*, the Court finds the Montana Supreme Court's reasoning persuasive.

Accordingly, and for the reasons outlined above, the Court concludes Aspen has demonstrated that TGC's claim against Hendrickson and Sweeny falls outside the scope of the Aspen Policy's insuring agreement, which means there is no potential for coverage.  Because the TGC claim falls outside the Aspen Policy's insuring agreement, the Court need not address Aspen's argument that Hendrickson's failure to disclose the potential malpractice claim on the Aspen Policy application provides a separate and additional basis for concluding there is

no potential for coverage of the TGC claim. Absent any potential for coverage, Aspen has no obligation to defend or indemnify the TGC claim.

    3.   <u>Whether Aspen waived its right to refuse to defend Hendrickson and Sweeney</u>

Hanover also maintains that Aspen waived its right to decline a defense to Hendrickson and Sweeney and deny coverage under Aspen Policy by failing to timely act during the initial stages of the underlying claim.  Aspen counters that there is no evidence of a voluntary and intentional waiver because it reserved its rights upon tender of the TGC claim by its insured while it conducted an investigation.

"Waiver is a voluntary and intentional relinquishment of a known right or claim," which "may be proven by express declarations or by a course of conduct which induces the belief that the intent and purpose was wavier." *McKay v. Wilderness Development, LLC*, 221 P.3d 1184, 1190 (Mont. 2009).  "To establish a waiver, the party asserting waiver must demonstrate that the other party knew of the existing right, acted inconsistent with that right, and prejudice resulted to the party asserting waiver." *McKay*, 221 P.3d at 1190.

Hanover takes the position that these elements are satisfied here based on the delay between the time when Hendrickson reported the TGC claim to Aspen, and the time when Aspen finally responded with a coverage position letter. Hendrickson first reported the TGC claim to Aspen on November 7, 2019. (Doc.

64 at 4, ¶ 9). In a December 5, 2019 email to Hendrickson and Sweeney, Aspen reserved "its rights and defenses in this matter under the [Aspen] policy, at law and/or in equity." (Doc. 61 at 11, ¶ 32; Doc. 61-1 at 26). Hanover sent a tender letter to Aspen on January 27, 2020, (Doc. 34 at ¶8), and sent another letter to Aspen on March 19, 2020 requesting Aspen accept tender of the defense. (Doc. 2 at ¶ 32; Doc. 8 at ¶ 32). On May 11, 2020, Aspen issued its coverage position letter advising Hendrickson that "based upon its investigation and review of the materials provided, Aspen does not believe coverage exists for the TGC claim." (Doc. 61-1 at 25).

Hanover argues the elements of waiver are satisfied here because Aspen knew of its right to decline a defense to Hendrickson and Sweeney, and acted inconsistent with that right by not sending its coverage position letter until May 11, 2020 – nearly four months after TGC filed the underlying lawsuit and nearly six months after Hendrickson first tendered the TGC claim. Hanover further contends that Aspen's failure to respond to its insured resulted in prejudice to both Hendrickson and Hanover, because Hendrickson was left not knowing whether the TGC claim would be covered, and Hanover was left with the obligation of providing a defense, incurring costs and fees, and being forced to file this lawsuit.

Particularly in light of the fact that Aspen reserved its rights and defenses under the Aspen Policy, the Court finds Hanover has not sufficiently demonstrated

that Aspen knowingly and intentionally relinquished its right to decline a defense

to Hendrickson and Sweeney. Hanover does not cite any case from Montana or

elsewhere supporting its position that an insurer waives its right to decline a

defense by failing to issue a coverage determination within a certain period of

time, particularly where the insurer expressly reserves its rights and defenses under

the policy. Although Aspen did not issue its coverage letter until five months after

it first received notice of the TGC claim, the Court cannot say under the

circumstances that Aspen was acting inconsistent with its right to decline a defense

during that period. Thus, the Court concludes Aspen did not waive its right to

refuse to decline a defense to Hendrickson and Sweeney and deny coverage under

Aspen Policy.

> 4.    Whether any coverage provided by the Hanover Policy is excess to
>        the coverage provided by the Aspen Policy

Finally, Hanover argues in support of its motion for summary judgment that

if the Hanover Policy affords any coverage, it is excess to the coverage provided

by the Aspen Policy. In their cross-motion for summary judgment, Hendrickson

and Sweeney join in Hanover's argument that "if the Hanover policy affords any

coverage, it is excess to the Aspen policy." (Doc. 58 at 11).

Hanover has since changed its position, and acknowledges that because the

Hanover Policy and Aspen Policy both contain similar provisions concerning other

insurance, if there is coverage under the Hanover Policy along with coverage under

the Aspen Policy, the covered claims would be covered on a pro rata basis. (Doc. 69 at 10). Hanover and Aspen are correct, that under Montana law, where two policies cover the same risk and both contain an excess other insurance clause, the result is a pro rata sharing between the two policies. *Bill Atkin v. Volkswagen, Inc. v. McClafferty*, 213 Mont. 99, 108 (1984). This is a moot point, however, in light of the Court's determination that the TGC claim is not covered by the primary coverage provisions of the Hanover Policy or the ERP Endorsement, and there is no potential for coverage under the Aspen Policy.

## IV.  <u>Conclusion</u>

For the reasons discussed above, the Court concludes there is no coverage of the TGC claim under the Hanover Policy. Thus, Hanover has no obligation  to defend and indemnify Hendrickson or Sweeney in connection with the TGC claim. The Court further concludes there is no potential for coverage of the TGC claim under the Aspen Policy. Thus, Aspen has no obligation to defend and indemnify Hendrickson or Sweeney in connection with the TGC claim, and has no obligation to reimburse Hanover for any defense costs and fees. Therefore,

IT IS RECOMMENDED that:

(1)    TGC's Motion for Partial Judgment on the Pleadings (Doc. 44) be DENIED;

50

(2)     Hanover's Motion for Summary Judgment (Doc. 53) be GRANTED

to the extent it seeks a declaratory judgment stating that it has no obligation to

defend and indemnify either Hendrickson or Sweeney under the Hanover Policy.

(3)     Hendrickson and Sweeney's Cross-Motion for Summary Judgment

(Doc. 57) seeking a declaration that Hanover is obligated to provide a defense and

indemnification under the Hanover Policy be DENIED, and;

(4)     Aspen's Cross-Motion for Summary Judgment against Hanover and

Motion for Summary Judgment on Hendrickson's Cross-Claim (Doc. 62) seeking a

declaratory judgment stating that it has no obligation to defend and indemnify

either Hendrickson or Sweeney under the Aspen Policy be GRANTED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of

the Findings and Recommendation of the United States Magistrate Judge upon the

parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to

the findings and recommendations must be filed with the Clerk of Court and copies

served on opposing counsel within fourteen (14) days after entry hereof, or

objection is waived.

DATED this 10th day of June, 2021.

_____

Kathleen L. DeSoto
United States Magistrate Judge

51